Jamie L. PETERS, by his Next Friend Sandra PETERS, Sandra Peters, Individually, and Ronald Peters, Appellants,

v.

Bruce J. VANDER KOOI and Buena Vista Clinic, P.C., Appellees.

No. 90–1726.

Supreme Court of Iowa.

Jan. 20, 1993.

Rehearing Denied Feb. 18, 1993.

Michael J. Galligan of Michael J. Galligan Law Firm, P.C., Des Moines, for appellant.

Francis Fitzgibbons, Joseph L. Fitzgibbons, and Harold W. White of Fitzgibbons Brothers, Estherville, for appellees.

Considered by HARRIS, P.J., and CARTER, LAVORATO, NEUMAN, and SNELL, JJ.

CARTER, Justice.

Plaintiff Jamie L. Peters, a minor child, by his next friend and mother, Sandra Peters, appeals from an adverse judgment in a medical malpractice action. Also appealing are Sandra Peters, individually, and Jamie's father, Ronald Peters, who have claims in the same action for medical expenses and loss of services, companionship, and society under rule 8 of the Iowa Rules of Civil Procedure. The defendants are Dr. Bruce J. Vander Kooi and Buena Vista Clinic, P.C., with which he is associated.[1]

Among the grounds advanced for a reversal of the judgment is the contention that the district court incorrectly instructed the jury concerning alternative courses of treatment. Because we find no evidentiary support for the instruction that was given concerning that subject and find that it was potentially prejudicial, we reverse the district court's judgment and remand the action for a new trial of all issues.

The action seeks damages for all plaintiffs as a result of alleged brain damage sustained by Jamie L. Peters and resulting in loss of mental and physical function and

---

**1.** As submitted to the jury, the only basis for finding liability on the part of defendant Buena Vista Clinic, P.C. was under the doctrine of respondeat superior based on the alleged acts or omissions of defendant Bruce J. Vander Kooi. On this appeal, plaintiffs urge that the defendant clinic should also have been subjected to liability for the acts of Dr. Johannsen, another clinic associate. Because no act of Dr. Johannsen was identified in the pleadings or other issue-limiting document as a basis for liability of the clinic prior to trial, we believe this claim simply comes too late.

mental retardation. It is alleged that Jamie suffered these injuries as a result of negligent care provided by defendant Dr. Bruce J. Vander Kooi and defendant Buena Vista Clinic, P.C. The occurrences giving rise to this action happened during the twenty-four-hour period prior to Jamie's birth on September 18, 1986.

Jamie's mother, Sandra Peters, was admitted to Buena Vista County Hospital at approximately 9:30 p.m. on September 17, 1986. She had been under Dr. Vander Kooi's care for her pregnancy and believed that labor had commenced. Because her labor had not progressed by 10:15 a.m. on the following morning, Dr. Vander Kooi prescribed the drug Pitocin. Pitocin is an artificial form of Oxytocin, a substance produced naturally by the human body that serves as a catalyst to labor contractions during childbirth. During the administration of that drug, a monitor was engaged to indicate fetal heart rate and any changes therein. Expert testimony was offered by both plaintiffs and defendants concerning the significance of this monitoring in predicting an oxygen deprivation problem.

Plaintiffs contend that defendants were negligent in not assuring the availability of a physician capable of performing a cesarean section during the period of Sandra Peters' labor. This claim is premised on the contention that Pitocin-induced labor is known to increase the risk of oxygen deprivation. That circumstance can require an immediate cesarean section to prevent brain damage to the child. While the several expert witnesses differed somewhat as to the time when the fetal heart monitor reading reached the danger level, there was a consensus that on all Pitocin-induced deliveries cesarean section availability is essential.

Dr. Vander Kooi was not trained to perform cesarean section surgery. There were only two surgeons in Storm Lake who were. When the infant's heart monitor reading reached levels that alarmed Dr. Vander Kooi, he attempted to contact both of those surgeons and learned that they were then unavailable. One of these surgeons, who was performing surgery in Manning, Iowa, did return at Dr. Vander Kooi's request. The birth was completed, however, before he arrived.

Plaintiffs offered the testimony of medical experts that the brain damage that had been sustained by Jamie was caused by oxygen deprivation. This expert testimony further indicated that, had a cesarean section been performed in a timely manner, Jamie would have been born a healthy child.

The action was originally filed in the Iowa District Court for Buena Vista County. At that time, Buena Vista County Hospital, a county entity, was also a defendant in the case. A motion for change of venue by plaintiffs, based on Buena Vista County's status as a party, was granted by the court pursuant to Iowa Rule of Civil Procedure 167(a). The case was transferred to Cherokee County where trial was commenced. A mistrial was declared in the jury selection process. At that point, plaintiffs dismissed their claim against Buena Vista County Hospital.

The district court determined that the dismissal of the county hospital removed any legal basis for continuing venue in Cherokee County. In rescheduling the mistried proceedings, the court ordered that venue be returned to Buena Vista County. Faced with this order, the plaintiffs moved for a change of venue under Iowa Rule of Civil Procedure 167(c). They urged that a substantial segment of the population of Buena Vista County was influenced favorably toward the defendants. That motion was overruled. The case was tried to a jury in Buena Vista County, which returned a verdict for the defendants. Other facts and circumstances relevant to our consideration of this appeal will be detailed in our discussion of the legal issues presented.

I. *The Venue Issues.*

■ The first issue that we consider is the contention that the district court erred in returning venue to Buena Vista County after the county hospital ceased to be a party to the action. Plaintiffs assert that, once venue is changed for any reason un-

der Iowa Rule of Civil Procedure 167 and a mistrial is granted, the court may only change venue a second time upon a showing of cause under rule 169. The latter rule incorporates the grounds of rule 167(a), (b), (c), or (d). Plaintiffs argue that no showing was made under any of those rules that would justify a change of venue back to Buena Vista County. In making this argument, they assume that rule 167(a) has no applicability to a venue change from Cherokee County to Buena Vista County because Cherokee County was at no time a party to the litigation.

We disagree with plaintiffs' challenge to the order returning venue to Buena Vista County. When a specific venue rule is conditioned upon the identity of a party to an action and that party later ceases to be a litigant, the basis for applying the specific rule ceases to exist. We have recognized that, when a particular statute establishes venue in the county of residence of one but not all defendants, the removal of that defendant from the case requires dismissal of the action against the nonresident defendants with a right to refile the action against those defendants in the proper county. *Reimers v. Honeywell, Inc.*, 457 N.W.2d 336, 339–40 (Iowa 1990).

Under the circumstances involved in *Reimers*, dismissal and refiling was mandated because of the language contained in Iowa Code section 616.20 (1989). In the present case, the statute that allowed the initial change of venue to Cherokee County does not implicate section 616.20. Consequently, no dismissal of the action was mandated. Return to the county of original venue was warranted, however, absent exigent circumstances not apparent at the time return to Buena Vista County was ordered.

Plaintiffs assert that, even if the district court acted correctly in returning venue to Buena Vista County, it erred in not granting their subsequent motion for change of venue under rule 167(c). They base this claim on affidavits indicating that defendants were in a position to exert influence over a substantial number of the inhabitants of Buena Vista County. In examining this contention, we are mindful of the considerations that were discussed in *Thompson v. Rozeboom*, 272 N.W.2d 444 (Iowa 1978), concerning the influence that medical care providers may have over a broad cross-section of the community.

█ If the issue presented were only whether a reversal might be ordered as a result of the district court's overruling of plaintiffs' motion for change of venue, we are not convinced that such relief would be granted. Rulings of this nature are based on an abuse-of-discretion standard based on the record made by the moving party. *Locksley v. Anesthesiologists of Cedar Rapids*, 333 N.W.2d 451, 454 (Iowa 1983). We need not consider this issue, however, because, as indicated in a later portion of this opinion, the judgment must be reversed on another ground.

█ Because the case must be retried, we believe it will be appropriate for the district court to again consider plaintiffs' motion for change of venue based upon the information that was revealed by the examination of potential jurors at the first trial. It appears that twenty out of twenty-nine jurors examined had some health care connection with either the Buena Vista Clinic, P.C. or Dr. Vander Kooi, or both, either personally or through members of their family. If there is reason to believe that such relationships will exist for a similar portion of the jurors summoned for a second trial in Buena Vista County, a change of venue should be ordered prior to retrial.

II. *Plaintiffs' Challenges to Jury Instructions.*

We next consider plaintiffs' challenges to certain jury instructions. The instructions complained of include the following:

INSTRUCTION NO. 14

While the result of treatment administered to a patient by a physician is not in itself evidence of negligence, it is a circumstance to be considered in determining if such result is attributable to the physician's lack of skill or care.

An unsuccessful effort, mistake, or error in judgment by a physician is not

necessarily negligence but is a circumstance to be considered.

A physician is not negligent if he selects one of two or more alternate methods of treatment which were recognized by the medical profession as proper methods of treatment in September, 1986. A physician is not negligent because of an honest error of judgment so long as he exercised the requisite degree of care and skill in arriving at that judgment.

## INSTRUCTION NO. 15

You are instructed that the defendant cannot be found negligent merely because of a mistake in the treatment of his patients. Any error in treatment, if you find any, does not in and of itself constitute negligence. For the defendant to be found negligent, it must be shown by a preponderance of the evidence that the defendant, in treating the patient's condition, failed to use the degree of skill, care and learning ordinarily possessed and exercised by other general family practitioners in similar circumstances, as explained to you in Instruction No. 13.

## INSTRUCTION NO. 16

The defendant cannot be found negligent merely because of a mistake in the diagnosis of his patients. Any error in diagnosis, if you find any, does not in and of itself constitute negligence. For the defendant to be found negligent, it must be shown by a preponderance of the evidence that the defendant in diagnosing the patient's condition, failed to use the degree of skill, care and learning ordinarily possessed and exercised by other general family practitioners in similar circumstances, as explained to you in Instruction No. 13.

Plaintiffs objected at trial to the giving of Instruction No. 14 to the extent that it embellished on Iowa Uniform Civil Jury Instruction 1600.16 by advising the jury that "[a]n unsuccessful effort, mistake, or error in judgment by a physician is not necessarily negligence but is a circum-

stance to be considered." They further objected, as follows, to that portion of Instruction No. 14 that advised the jury concerning selection among alternative methods of treatment:

[T]here is no evidence of alternative forms of treatment in this case. The sole question is whether or not the form of treatment continued, Pitocin, was appropriate.

The second question was whether or not—when using Pitocin a physician is required to have someone available for a cesarean section. Those are straightforward questions and issues which don't involve alternatives, but a determination by the jury of what is the standard and whether the standard was violated.

Plaintiffs also objected to Instruction No. 15 (mistake in treatment) and Instruction No. 16 (mistake in diagnosis) on the ground that (1) these instructions were unnecessary to inform the jury of the defendants' duty of care as this court concluded in *Hutchinson v. Broadlawns Medical Center*, 459 N.W.2d 273, 276–77 (Iowa 1990); and (2) the giving of such instructions tend to unduly emphasize defendants' theory of the case. Defendants argue that the instructions that plaintiffs have challenged do not differ substantially from instructions this court has approved in the past. They further argue that such instructions are necessary to correctly advise a jury on the standard of care applied against a defendant physician in a medical malpractice case.

■ The considerations involved in plaintiffs' challenges to the mistake-in-treatment and mistake-in-diagnosis instructions are those that prompted us to declare in *Vachon v. Broadlawns Medical Foundation*, 490 N.W.2d 820, 824 (Iowa 1992), that in the future such instructions should not be given. We continue to adhere to that view. Instructions of this nature are not statements of the law that determine a physician's duty of care. They are comments on potential factual scenarios in which a standard of care may or may not have been adhered to. As such, they amount to comments on the evidence,

which were determined in *Hutchinson*, 459 N.W.2d at 276–77, to be unnecessary for the jury's determination of the issues.

We do agree with defendants' contention that they should be treated the same as the defendant in *Vachon* concerning the prospective rejection of the mistake-in-treatment and mistake-in-diagnosis instructions. Were these the only instructional issues involved, our conclusions concerning Instruction No. 15 and Instruction No. 16 would not warrant a reversal. There is, however, an issue concerning Instruction No. 14 that differs from the question presented in *Vachon* and that, we conclude, requires a reversal.

■■■ We have recognized that instructions should not marshal the evidence or give undue prominence to any particular aspect of a case. *Stover v. Lakeland Square Owners Ass'n*, 434 N.W.2d 866, 868 (Iowa 1989). The submission of instructions upon issues that have no support in the evidence is error. *Vachon*, 490 N.W.2d at 822; *Meck v. Iowa Power & Light Co.*, 469 N.W.2d 274, 276 (Iowa App. 1991).

■■■ In order for an instruction on alternative methods of treatment to have an adequate factual basis in the record, two elements must be shown by substantial evidence. These are: (1) that, with respect to a particular act or omission upon which the claim of negligence is predicated, there was more than one method of treatment acceptable to a physician exercising the degree of skill, care, and learning ordinarily possessed and exercised by other physicians in similar circumstances; and (2) that the physician considered these alternatives and exercised his or her best professional judgment in choosing the method of treatment that was utilized. Those elements were satisfied with respect to the instruction on alternative treatments in the *Vachon* case. In the present case, we find that they were not satisfied.

An expert witness for the defendant testified that

I think subject to understanding that the American Academy of Family Practice, they have their own policy and informa-

tion that they put out on Oxytocin use, different than the policies put out for example by the American College of Obstetrics and Gynecology, so the two groups see things sometimes differently, sometimes quite a bit differently.

Notwithstanding this testimony, there was no evidence that would connect this rather general statement to the specific acts or omissions that were alleged in the litigation and submitted to the jury in the court's instructions.

All of the specifications of negligence submitted to the jury that referred to specific acts or omissions related to the failure to arrange for the availability of a cesarean section. Defendant Vander Kooi in his own testimony did not contend that, with respect to these alleged acts or omissions, he selected from more than one alternative method of treatment acceptable for the situation with which he was confronted. He testified he believed that one of the two surgeons in Storm Lake who could perform cesarean section surgery would be available because they had always been available in the past, and he believed he had noticed that they were in the hospital the morning that the Pitocin therapy was initiated. Given this state of the record, the giving of the final paragraph of Instruction No. 14 was error.

■■■ We also believe that the error that existed in instructing the jury on alternative methods of treatment was prejudicial. Defendants' counsel argued to the jury as follows:

[A] physician is not negligent if he selects one or two or more alternative methods of treatment which were recognized by the medical profession as proper methods of treatment in September 1986.... Alternate methods. Alternate methods. Continue the Pit or stop the Pit. That's the alternative that he had, and that's what he was faced with. He selected one of those. Under that provision, selecting an alternative.

This contention was undoubtedly prompted by the court's instructions to the jury. However, Dr. Vander Kooi testified that it

would not have been prudent to continue the Pitocin therapy after the heart monitor revealed a dangerous condition if a surgeon had been available to perform a cesarean section. There was no medical testimony that, with respect to assuring the availability of such a surgeon, there were alternative methods of treatment recognized within the medical profession.

In summarizing our holding on the challenged jury instructions, we continue to adhere to the view expressed in *Vachon* that instructions such as Instruction Nos. 15 and 16 in the present case should no longer be given in medical malpractice litigation. For the same reasons, the second paragraph contained in Instruction No. 14 should not have been included. Instructions pertaining to selection of one of two or more alternative methods of treatment should only be given if the factual record satisfies the elements that we have previously identified in this opinion.

### III. *Evidence of Collateral Source Benefits.*

Because the issue is likely to arise again on retrial, we consider plaintiffs' claim that evidence of collateral source benefits was improperly allowed. At issue is that provision in Iowa Code section 147.136 (1991), which states:

> [T]he damages awarded shall not include actual economic losses incurred or to be incurred in the future ... to the extent that those losses are replaced or are indemnified by insurance, or by governmental, employment, or service benefit programs or from any other source except the assets of the claimant or of the members of the claimant's immediate family.

*Id.*

At trial, defendants were permitted to offer over plaintiffs' objection evidence of family support subsidy programs, in-home treatment services, licensed residential treatment facilities for handicapped children, Medicaid and SSI benefits and other family support subsidy programs. The witnesses who gave this evidence acknowledged that there were qualification requirements having to do with resources available to Jamie or other members of the Peters family.

In addition, defendants were permitted to offer over plaintiffs' objection evidence of medical insurance available to Jamie through his father's employer, Iowa Beef Packing Company. The current lifetime maximum benefits for the existing plan are $150,000 of which $80,159 remains unpaid. Coverage is provided only if the employee continues employment with IBP or chooses to continue coverage through payment of premiums after employment termination.

The thrust of plaintiffs' complaints concerning the admission of this evidence was the district court's failure to instruct the jury concerning the burden of proof in establishing the dollar amount by which any recovery should be diminished based on the contingencies that existed with respect to receipt of the collateral source payments. In addition to not instructing on the burden of proof, nothing in the court's instructions required the jury to resolve the several factual issues presented over collateral source benefits.

Because of the considerable uncertainty that existed with respect to the monetary value of these potential benefits, we believe it was essential that the jury be instructed as to the contingencies involved and that they be required to make specific findings concerning what collateral source amounts were in fact available to plaintiffs. The burden of proof on these issues should have been placed on defendants.

We have considered all issues presented and conclude that for the reasons stated in Division II of this opinion the district court must be reversed. The case is remanded to that court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.